# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

DAVID LAURENCE HODGES,

      Plaintiff,

v.

STATE OF MINNESOTA DEPARTMENT
OF CORRECTIONS, et
al.,

      Defendants.

Case No. 0:20-cv-00090-WMW-KMM

**REPORT AND
RECOMMENDATION**

---

This matter is before the Court on David Laurence Hodges' Motion for Preliminary Injunction to Compel Defendants to Provide Necessary Medical Evaluation. [ECF No. 50.] Specifically, Mr. Hodges asks the Court to enter an injunction requiring the Defendants to refer him to an ophthalmologist for an examination and treatment of vision loss following an injury in November 2018. For the reasons that follow, the Court recommends that the motion be denied.

## I.    Background

Mr. Hodges, an inmate in the custody of the State of Minnesota Department of Corrections ("DOC"), brings this case pursuant to 42 U.S.C. § 1983. He alleges that the Defendants violated his constitutional rights while acting under color of Minnesota law. Although Mr. Hodges has received medical care for eye complaints following the November 3, 2018 attack by other inmates, he has never been seen or treated by an ophthalmologist.

A.    **The Complaint**

Mr. Hodges filed his Complaint on January 7, 2020 asserting, in part, that the State Defendants and the Centurion Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment.[1] Compl. ¶ 42, ECF No. 1. Mr. Hodges alleges that on November 3, 2018 when he was incarcerated at the Minnesota Correctional Facility in Rush City, Minnesota, he was injured when two other inmates threw heated water mixed with a substance believed to be capsaicin cream into his face. *Id.* ¶ 30. After the incident, Mr. Hodges was taken to a hospital where it was determined that he suffered second-degree burns to his chest, face, and the inside of his eyes. *Id.* ¶ 32. He also claims that he suffered substantial vision loss in his left eye, which has worsened over time. *Id.* ¶¶ 32, 35–36. Mr. Hodges asserts that the emergency room referred him to an ophthalmologist for follow-up treatment, but DOC medical staff did not honor the referral. *Id.* ¶ 34. Dr. Darryl Quiram, a Centurion physician contracted by the DOC to provide medical care to inmates, arranged optometrist appointments for Mr. Hodges, but allegedly refused to send him to an ophthalmologist. *Id.* ¶ 36. Because they will not arrange for him to see an ophthalmologist, Mr. Hodges claims that the DOC Defendants and the Centurion Defendants have exhibited deliberate indifference to his serious medical needs. *Id.* ¶ 42. He ultimately seeks both damages and injunctive relief.[2]

---

[1]    The "State Defendants" include the State of Minnesota Department of Corrections and several DOC officials: Ashlee E. Berts, Derek L. Gunderson, Nanette M. Larson, Cathy Nielsen, James M. Olson, Stacy R. Olson, and Jeffrey T. Titus. The Centurion Defendants include Centurion of Minnesota, LLC, and Dr. Darryl Quiram.

[2]    After filing his motion for a preliminary injunction, Mr. Hodges filed an Amended Complaint in which he added claims against several DOC officials who allegedly failed to protect him from a known risk posed by the inmates who attacked him. Am. Compl., ECF

(footnote continued on following page)

### B.     Medical Care After the Attack

Following the November 3, 2018 attack, Mr. Hodges was seen in the emergency room at a hospital near the prison where he is confined. Novak Aff. ¶ 5, ECF No. 68; Novak Aff., Ex. D at 1 ("Weingarden Report"), ECF No. 75. At the ER on the date of the assault, Mr. Hodges complained of blurred vision, a burning sensation in his eyes (primarily the left where he had difficulty seeing anything other than light), swelling around his eyes, and other symptoms. Kushner Decl., Ex. 1 at 1, 11, ECF No. 53. The ER doctor, Scott Moses, M.D., irrigated Mr. Hodges' eyes and prescribed a TobraDex ointment based on an ophthalmologist recommendation. *Id.*, Ex. 1 at 8; *id.*, Ex. 2 at 18. Mr. Hodges was also given post-care instructions for a corneal abrasion. *Id.*, Ex. 2 at 18, 29–30. Dr. Moses indicated that Mr. Hodges should be re-evaluated the following Monday in the eye clinic. *Id.*, Ex. 2 at 18. The ER records do not explicitly mention a referral to an ophthalmologist.

Mr. Hodges had follow-up appointments with various medical providers concerning his eyes (and other issues) on November 5, 2018, November 9, 2018, December 13, 2018, January 7, 2019, January 24, 2019, February 14, 2019, March 7, 2019, April 5, 2019, April 18, 2019, September 19, 2019, October 19, 2019, and January 31, 2020. Weingarden Report at 1–4. Mr. Hodges saw optometrists on several of these occasions. Novak Aff. ¶ 2, Ex. A ("Quiram Dep.") at 24–25. Most recently, Mr. Hodges was examined on July 13, 2020. Reply Decl. of Dr. Michael S. Lee ("Lee Reply Decl.") ¶ 3, ECF No. 83.

---

No. 96. The allegations regarding inadequate medical care and the Defendants against whom those allegations are directed remain largely the same in both versions of the complaint.

Since he was treated in the ER, Mr. Hodges has had twelve appointments in which he spoke with medical providers regarding care for his eyes, though he has not seen an ophthalmologist. *See* Weingarten Report at 1–4. On November 5, 2018, the Monday after the incident, Dr. Virginia Mondac noted that Mr. Hodges continued to complain of vision problems in his left eye, but his cornea was clear and he was scheduled to see an optometrist later that week. Kushner Decl., Ex. 2 at 5. At a November 9, 2018 optometry appointment, he received a visual acuity test with his vision recorded as 20/25 and 20/30 and slightly elevated eye pressures. *Id.*, Ex. 2 at 17. On December 11, 2018, Dr. Quiram noted that a follow-up optometry appointment had been rescheduled due to a lockdown on Mr. Hodges' unit. *Id.* at 5, 17. At the optometry appointment on December 13th, Mr. Hodges reported seeing floaters, but dilation of his eyes showed no retinal tears and no abnormality in his corneas. *Id.* at 17. A follow-up appointment was planned for a month later to monitor Mr. Hodges' eye pressure. *Id.*

In January 2019, Dr. Quiram noted that Mr. Hodges had been seen several times for complaints about his vision. In connection with Mr. Hodges' diabetes, Dr. Quiram observed that Mr. Hodges had difficulty controlling his blood sugar levels and was not complying with his prescribed diet. *Id.* at 3. Later that month at an optometry appointment, Mr. Hodges complained of worsening vision. *Id.* at 16. His visual acuity was assessed at 20/20 and 20/25 and eye drops were prescribed. *Id.* After he began using the eye drops, his eye-discomfort improved and his eye pressures reduced. *Id.* Another follow-up with optometry was recommended to monitor the effects of the eye drops. *Id.* In March 2019, his eye drop prescription was changed after he complained of redness in his eyes. *Id.* In April 2019, he reported that his concerns about redness in his eyes with the prior prescription had subsided.

*Id.* at 15.

The DOC transferred Mr. Hodges to a prison in Moose Lake, Minnesota, on August 31, 2019. *Id.* at 2. Shortly after he arrived at Moose Lake, on September 19, 2019, Mr. Hodges was seen by Traci Rogers, a Nurse Practitioner, for a chronic type-2 diabetes checkup. *Id.* Mr. Hodges complained about his eye problem and the medical record from the appointment states: "I am going to put in a referral for him to be seen in ophthalmology today in regard to this, and it sounds like he is on or has been on some eyedrops and we will need renewal of that at some time." *Id.* Although these typed notes mention an ophthalmology referral, in her handwritten order following the appointment, Nurse Rogers wrote: "referral to ~~opthalm~~ optometry…" and the word "ERROR" is written above the crossed-out portion of ophthalmology. *Id.* at 10.

In October 2019, Mr. Hodges asked for a referral to an ophthalmologist when he saw nursing staff at the Moose Lake facility. *Id.* at 1. He was told to speak with his optometrist at the next scheduled appointment regarding the need for an additional referral. *Id.* at 1. The nursing staff instructed Mr. Hodges on how to control blood-sugar levels because his diabetic condition could damage his eyes if he failed to keep his blood sugar low. *Id.* At a follow-up appointment on January 31, 2020, he complained of blurry vision in his left eye and floaters, and another optometry appointment was recommended. *Id.* at 12.

Mr. Hodges next saw an optometrist on July 13, 2020. Novak Decl., Ex. C. The several-month gap between appointments was caused by the COVID-19 pandemic. The optometrist performed an intraocular-pressure test and visual-field test, continued his prescription for eye drops, and planned a follow-up visit for six months later. *Id.*

Although the records show that Mr. Hodges has asked to see an ophthalmologist several times, no referral was ever made, and he has not seen such a specialist. Quiram Dep. at 26. Dr. Quiram, in reviewing optometry notes, concluded that no such referral was necessary because Mr. Hodges' eye pressures returned to normal as a result of the eye drops he was prescribed to treat glaucoma. In addition, concerns of a corneal abrasion were resolved, and no surgical intervention was deemed appropriate for the floaters he reported. *Id.*

### C.    Expert Opinions

Both sides have submitted expert opinions regarding the care Mr. Hodges received for his eye problems since November 3, 2018. Plaintiff's expert, Dr. Michael Lee, is a Board-Certified Ophthalmologist. He indicates that he was provided insufficient information to give an opinion regarding the nature and extent of Mr. Hodges' eye injuries. Lee Decl. ¶ 10, ECF No. 52. However, Dr. Lee noted, in his June 28, 2020 opinion, that Mr. Hodges needed a visual-field test to evaluate his complaints of vision problems, a pressure check, an optical-coherence-tomography ("OCT") test, and a thorough examination for scar tissue and other injuries. *Id.* ¶¶ 10–11. Dr. Lee states: "There is a substantial chance that a proper examination of Mr. Hodges would lead to an opportunity to correct his injury. There is also a substantial possibility that the delay in proper evaluation and treatment has prevented or reduced the chances of correcting or alleviating Mr. Hodges' injury." *Id.* ¶ 12. Dr. Lee further opined that because optometry appointments "were not successful in identifying and correcting the problem, the failure to refer Mr. Hodges to an ophthalmologist for a thorough examination is professionally inexcusable." *Id.* ¶ 13.

Defense expert, Dr. Alan Weingarden, also a Board-Certified Ophthalmologist, disagrees with certain conclusions drawn by Dr. Lee. For example, Dr. Weingarden indicates

that the OCT test Dr. Lee recommended would not need to have been performed during the immediate aftermath of Mr. Hodges' chemical-burn injuries. Dr. Weingarden indicates that the OCT test "would be in keeping with an evaluation for glaucoma, which ultimately would be done in approximately one-year time interval" in optometry. Weingarden Report at 4; *see also id.* at 5 ("Regarding following the glaucoma, that would be appropriate care for an optometrist and at some future point, visual fields and optical coherence tomographies would have been done probably at a one-year interval."). Mr. Hodges was, in Dr. Weingarden's view, "not in need of an [OCT] or a visual field" test during the period immediately following the assault because "[h]e had pressures which were returning to normal," and "[h]e had a cup-to-disc ratio that was essentially slightly abnormal, but not severely abnormal…." *Id.* at 4. Dr. Weingarden also opined that "[t]here is no need for an ophthalmologic referral on the basis of the examinations done by the optometrist. They did not find anything that required further intervention by an ophthalmologist. They did not find any scar tissue or any damage to the cornea." *Id.* He believes that Mr. Hodges received treatment for his eye problems that was consistent with the applicable standard of care. *Id.* at 5.

In a reply declaration, Dr. Lee indicates that the optometrist's notes from the July 2020 appointment show "Mr. Hodges' visual fields were abnormal." Lee Reply Decl. ¶ 3. Dr. Lee also opines that the medical records still show no OCT testing has been performed. *Id.* ¶ 4. He agrees that an OCT test would not be necessary for a chemical burn, but suggests the test should have been performed because Mr. Hodges may have experienced blunt-force trauma during the assault. *Id.* Further, Dr. Lee agrees with the defense suggestion that Mr. Hodges' "eye problems could be related to his diabetes." *Id.* ¶ 6. But Dr. Lee explains: "[t]his … is another reason why he needs an OCT to determine if there is swelling of the retina.

This cannot be seen with a regular eye exam." *Id.* In addition to the OCT test, Dr. Lee states that Mr. Hodges should have received a gonioscopy exam to test for angle recession (which could explain his high pressures), and a pachymetry test. *Id.* ¶ 5. Dr. Lee agrees that optometrists can perform these tests and evaluate Mr. Hodges' eye injuries, but he opines that a thorough evaluation should have been performed within days of the injury. *Id.* ¶ 7. Dr. Lee opines that "the applicable standard of professional care requires Mr. Hodges receive a thorough evaluation by a qualified eye care provider with the necessary minimum testing." *Id.*

## II.    Legal Standards

When considering a motion for a preliminary injunction, district courts consider four factors:

> (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citing *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013)) (internal quotations and citation omitted). "If a party's likelihood of succeeding on the merits is sufficiently low, a court may deny a preliminary injunction even if the other three factors—irreparable harm, balance of harms, and the public interest—weigh in the party's favor." *McMahon v. Delta Air Lines, Inc.*, 830 F. Supp. 2d 674, 688 (D. Minn. 2011). This factor does not require the moving party to "prove a greater than fifty per cent likelihood that he will prevail on the merits." *Dataphase*, 640 F.2d at

113 (rejecting a test that would require the movant to show a "mathematical probability of success at trial"). Instead, the movant is required to show a "fair chance" of succeeding on the merits. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013).

"Even when a plaintiff has a strong claim on the merits, preliminary injunctive relief is improper absent a showing of a threat of irreparable harm." *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (citing *Watkins*, 346 F.3d at 844). To establish irreparable harm for purposes of a preliminary injunction a party must show "that a cognizable danger—more than a 'mere possibility'—exists of a future violation." *C.H. v. Sullivan*, 718 F. Supp. 726, 730 (D. Minn. 1989). "'[A] party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski*, 648 F.3d at 706 (quoting *Iowa Utils. Bd. V. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).

The party seeking a preliminary injunction bears the burden of showing that an injunction should issue. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). "The burden is especially heavy where, as in this case, the moving party seeks not to maintain the status quo, but to obtain relief similar to that which it could obtain after a trial on the merits." *Brooks v. Roy*, 881 F. Supp. 2d 1034, 1049 (D. Minn. 2012) (citing *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993); *Scott v. Benson*, 863 F. Supp. 2d 836, 842 (N.D. Iowa 2012) (same); *Aerotek, Inc. v. Murphy*, No. 4:17CV2469 HEA, 2017 WL 4617109, at * 6 (E.D. Mo. Oct. 16, 2017) (same).

## III.    Analysis

Mr. Hodges asserts that he has met his burden to show that preliminary injunctive relief is appropriate. Because Mr. Hodges seeks an injunction that would alter, rather than

maintain, the status quo, and one that would give him the injunctive relief he ultimately seeks as part of this lawsuit, his burden is especially heavy.[3] *Brooks*, 881 F. Supp. 2d at 1049. Having carefully reviewed the record, the Court concludes that Mr. Hodges has failed to carry that burden and his motion should be denied.

### A.   Likelihood of Success

Determining the probability that Mr. Hodges will succeed on the merits requires the Court to evaluate his claim that the Defendants have been deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights. The Eighth Amendment prohibits "cruel and unusual punishments." *Estelle v. Gamble*, 429 U.S. 97, 101–02 (1976). This requires the State "to provide medical care for those whom it is punishing by incarceration." *Id.* at 103. Prison officials violate the Eighth Amendment when "they commit 'acts or omissions sufficiently harmful to evidence deliberate indifference to [an inmate's] serious medical needs.'" *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007) (quoting *Estelle*, 429 U.S. at 106). A plaintiff must show "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

A deliberate-indifference claim based on a failure to provide treatment requires an inmate to establish that "prison officials knew that the condition created an excessive risk to

---

[3]   In the Complaint, Mr. Hodges asks the Court to "Order an injunction on Defendants requiring them to arrange for an evaluation of Plaintiff by a qualified ophthalmologist and to follow the recommendations of said ophthalmologist." Compl., Prayer for Relief ¶ 3, ECF No. 1-1. In an Amended Complaint filed on October 6, 2020, Mr. Hodges still seeks injunctive relief, including the ophthalmologist referral, but he also requests, "in the alternative [a referral to] a medical provider willing able to perform the necessary testing to evaluate and treat [his] injuries." Am. Compl., Prayer for Relief ¶ 3, ECF No. 96.

the inmate's health and then failed to act on that knowledge." *Dulany*, 132 F.3d at 1239. "Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoners' serious medical needs." *Id.* (citing *Estelle*, 429 U.S. at 104–05). Mere negligence, however, is not enough to demonstrate a constitutional violation. *Id.* (citing *Estelle*, 429 U.S. at 106).

It is not enough for a prisoner to simply argue that a different course of care would be more effective. Courts have repeatedly noted that a prisoner's "difference of opinion over matters of expert medical judgment or a prescribed course of medical treatment fails to state a federal constitutional question." *See, e.g.*, *Randall v. Wyrick*, 642 F.2d 304, 308 (8th Cir. 1981). However, this does not mean that a deliberate indifference claim can never be successful simply because a prisoner has received some care. Indeed, "a total deprivation of care is not a necessary condition for finding a constitutional violation: 'Grossly incompetent or inadequate care can also constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment.'" *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quoting *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)). Where prison officials have provided treatment that is inadequate to address a prisoner's condition, a preliminary injunction requiring the provision of additional necessary care may be appropriate. *Hicklin v. Precynthe*, No. 4:16-CV-01357-NCC, 2018 WL 806764, at *12 (E.D. Mo. Feb. 9, 2018) (rejecting argument from Missouri Department of Corrections that plaintiff was unlikely to succeed on the merits of her Eighth Amendment claim because she was merely disagreeing with the refusal to provide her preferred treatment for gender dysphoria).

There is no dispute at this stage that Mr. Hodges' alleged eye problems constitute an objectively serious medical need. Instead, the parties dispute whether Mr. Hodges has received constitutionally adequate care. For the reasons that follow, the Court concludes that Mr. Hodges has not shown a probability of success on the merits of his claim that the Defendants were deliberately indifferent.

Mr. Hodges has received significant medical care for his eye problems in the aftermath of the November 3, 2018 assault. Shortly after the attack, he was taken to the ER, received treatment for his injuries, and was provided follow-up care. Subsequent medical records show stabilization of his eye pressures when treated with eyedrops. That prescription was even changed in response to redness that developed due to the medication initially prescribed. Initial concerns of a corneal abrasion were resolved not long after his treatment at the ER and none of the records suggest any abrasion remains. Evaluation of his vision has not revealed significant deterioration over time. The records also suggest that Mr. Hodges' elevated eye pressure readings are attributable to complications from diabetes, as opposed to any refusal by the Defendants to provide necessary treatment. Mr. Hodges continues to receive regular medical care with optometrists when he complains about problems with his eyes, and the optometry appointments he has missed or that have been rescheduled do not appear to have been cancelled because the Defendants simply declined to give him care. Overall, the evidence submitted indicates that Mr. Hodges has received treatment based on professional judgments made by his medical providers.

Contrary to Mr. Hodges' claim, there is no clear showing in the record that he was ever referred to an ophthalmologist. Mr. Hodges contends that he was referred to an ophthalmologist on two occasions: (1) at the ER immediately following the assault; and (2) in

September 2019 after he was transferred to the DOC facility in Moose Lake. But the record does not support Mr. Hodges' position. First, Dr. Moses, the attending ER physician, provided only that follow up should take place in an eye clinic the Monday after the attack. The ER records do not explicitly mention to an ophthalmology referral and Dr. Quiram testified that this was only a generic eye-clinic referral. Second, after Mr. Hodges' transfer to Moose Lake, the RN's handwritten note of her September 19, 2019 encounter with him suggests that the statement in her typed notes that she would put in a referral to ophthalmology was an error. Indeed, in her handwritten notes, she crossed out "~~ophthalm~~…" and replaced it with optometry, writing "ERROR" above the crossed-out term. Mr. Hodges points to no other evidence that any physician who has evaluated him believes a referral to ophthalmology was necessary, and the Court has located none.

In addition, the evidence supplied by the parties' experts does not show that Mr. Hodges is likely to succeed on the merits of his deliberate-indifference claim regarding the absence of an ophthalmology referral. Although Dr. Lee opined that the failure to make such a referral was professionally inexcusable, he offered that assessment based on an admittedly incomplete review of the medical records. He did not reiterate that opinion in his reply declaration. Meanwhile, Dr. Weingarden opined that Mr. Hodges' medical history since the assault does not require a referral to ophthalmology. On this record, the Court cannot find that Mr. Hodges has shown a fair chance of success on the merits.

This case is readily distinguishable from the only decision this Court has located where a district court granted a prisoner's motion for a preliminary injunction requiring a referral to an ophthalmologist for evaluation. In *Foster v. Ghosh*, 4 F. Supp. 3d 974 (N.D. Ill. 2013), the plaintiff had a cataract surgery in his left eye in 1977 and was, thereafter, legally

blind in that eye. *Id.* at 977. He saw an optometrist regarding the return of the cataract in his left eye in 2008 and eventually complained of a cataract in his right eye in 2009. *Id.* at 977–78. The prison doctor declined to order surgical intervention or refer the plaintiff to an ophthalmologist on multiple occasions over a five-year period. *Id.* at 978, 980–81. The plaintiff's resort to the prison's grievance procedures were unsuccessful, and the plaintiff said that prescription glasses did not help his symptoms from the cataracts in either eye. *Id.* The court granted the plaintiff's motion for a preliminary injunction requiring the defendants to refer the plaintiff to an ophthalmologist because the evidence showed that prison officials were simply rejecting the medical need for a specialist's evaluation of the cataract on grounds of expense. There was a clear record that the cataracts could only be treated by surgery, and evaluation of whether the surgery was appropriate should have been made by the physician qualified to perform the procedure. *Id.* at 981. There was no dispute in *Foster* that an optometrist was unable to treat the problem without surgical intervention and that the only treatment that had been provided was ineffective while the plaintiff's condition continued to worsen over time. *Id.*

The situation here is quite different. Mr. Hodges' condition has not clearly gotten worse over time, treatments he has received have been effective in addressing observed problems, and he has not identified a particular eye condition that can only be evaluated by an ophthalmologist. Where the record does not show that prison medical personnel provided grossly inadequate care, courts have not found it appropriate to issue a preliminary injunction. *See, e.g.*, *Hunt v. Mohr*, No. 2:11- CV-00653, 2011 WL 4467764, at *4 (S.D. Ohio Sept. 26, 2011), *report and recommendation adopted*, No. 2:11-CV-00653, 2012 WL 368060 (S.D. Ohio Feb. 3, 2012) (finding that the plaintiff failed to show a likelihood of success on the merits for his deliberate

indifference claim based on an allegation of inadequate eye care where an ophthalmologist recommended surgery to remove a cataract, but another doctor determined the procedure was unnecessary and that the plaintiff's condition could be treated differently).

Finally, the Court notes that Mr. Hodges' request for a preliminary injunction appears to have evolved somewhat from his initial claim that a referral to ophthalmology was medically necessary. He now seeks, in the alternative, an order requiring additional testing be performed based on Dr. Lee's reply declaration.[4] However, at most the expert reports from Dr. Lee and Dr. Weingarden indicate that they disagree about whether the testing already performed complied with the applicable standard of professional care. It appears that the experts actually agree that the testing recommended by Dr. Lee can be performed by an optometrist. Dr. Lee does opine that the failure to conduct certain tests right after the assault falls below the applicable professional standard of care, and "medical treatment may so deviate from the applicable standard of care as to evidence a physician's deliberate indifference' in violation of the Eighth Amendment." *Postawko v. Missouri Dep't of Corr.*, No. 2:16-CV-04219-NKL, 2017 WL 1968317, at *6 (W.D. Mo. May 11, 2017) (quoting *Moore v. Duffy*, 255 F.3d 543 (8th Cir. 2001)). Admittedly, the merits showing Mr. Hodges has made with respect to the adequacy of the testing is stronger than the case he has presented for an injunction requiring an ophthalmology referral. But Dr. Weingarden's report suggests that the testing recommended by Dr. Lee would not need to be scheduled immediately to treat Mr. Hodges' glaucoma. The mere

---

[4]    *Compare* Compl., Prayer for Relief ¶ 3 (seeking an injunction requiring referral to an ophthalmologist), *with* Am. Compl., Prayer for Relief ¶ 3 (seeking, in the alternative to an ophthalmology referral, an injunction requiring testing); *see also* Pl.'s Reply (requesting a preliminary injunction for the appointment of an independent specialist or optometrist to engage in testing and evaluation of plaintiff's eye problems), ECF No. 82; Lee Reply Decl. ¶¶ 5–7 (opining that additional testing is necessary).

fact that the parties' experts have a disagreement regarding the propriety of the testing does not convince the Court that Mr. Hodges is likely to prevail in showing that the care he received so deviated from the certain standard of care that it was grossly incompetent or inadequate. And the assertion that testing should have been done immediately after the assault actually does little to establish that such testing would be necessary now, almost two years later. Mr. Hodges may ultimately be able to establish his deliberate-indifference claim at trial based on his inadequate-testing theory, but at this stage, he has not met his burden to show that there is a fair chance he will prevail.

For these reasons, the Court finds Mr. Hodges has not met his burden to show a probability of success on the merits.

### B.    Irreparable Harm

The Court also finds that Mr. Hodges has failed to show irreparable harm. The record simply does not support a conclusion that Mr. Hodges faces an imminent threat to his health such that there is a clear and present need for equitable relief. Indeed, the evidence does not demonstrate that his condition has continued to worsen over time or that it is substantially likely get worse if no injunction is issued. The most direct evidence suggesting a possibility of irreparable harm is Dr. Lee's statement that "[t]here is … a substantial possibility that the delay in proper evaluation and treatment has prevented or reduced the chances of correcting or alleviating Mr. Hodges' injury." Lee Decl. ¶ 12. However, this evaluation was provided before Dr. Lee had a chance to review the medical records in full and is too generalized to show a clear and *present* need for an ophthalmologist to evaluate Mr. Hodges' eyes or for the Court to order specific tests that have not been conducted by the medical providers who are giving Mr. Hodges ongoing medical care.

Rather than reflecting a showing of irreparable harm, the record indicates that Mr. Hodges has been "examined and treated on numerous occasions" for his ongoing vision problems, yet he seeks further examination and treatment by a specialist. *Wheatley v. Smith*, No. 12–cv–880 (DWF/AJB), 2012 WL 5930665, at *2 (D. Minn. Oct. 25, 2012), *report and recommendation adopted*, No. 12–cv–880 (DWF/AJB), 2012 WL 5931544 (D. Minn. Nov. 27, 2012). There is little to support the notion that Mr. Hodges faces a significant likelihood of greater eye complications if he does not receive preliminary injunctive relief requiring a referral to an ophthalmologist or specific testing by an independent physician. As the court found in *Wheatley* and in marked contrast to *Foster v. Ghosh*, *supra*, this is not a situation where it has been demonstrated that the request to be seen by a specialist is needed to avoid irreparable harm.

### C.    Balance of Harms and Public Interest

Because Mr. Hodges has not shown that there is a threat of irreparable harm, analysis of the remaining factors may be unnecessary. *See, e.g.*, *Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010) ("Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction.") (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir.2003)). Therefore, the Court's discussion of the final two factors will be brief

Regarding the balance of harms to the parties, although Mr. Hodges has not demonstrated a threat of irreparable harm to justify a preliminary injunction, it is at least

possible, as asserted by Dr. Lee, that a delay in the testing he recommends will further prolong a chance for a full assessment and optimal corrective course of action for his eye problems. Nevertheless, courts must proceed cautiously when their decisions would interfere with prison administration. *Goff v. Harper,* 60 F.3d 518, 520 (8th Cir.1995) ("[I]n the prison context, a request for injunctive relief must always be viewed with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration."). The potential harm supported by the record does not outweigh the harm that would be caused to prison administration if the Court were to step in and enjoin the Defendants to provide specific medical care prior to a trial on the merits.

With respect to the final factor, the Court concludes that entering an injunction would not be in the public interest. Mr. Hodges has not shown that he is likely to succeed on the merits, undercutting his claim that it is in the public interest to prevent a violation of his constitutional rights. *See Rivera v. Kalla*, No. 12-cv-1479, 2012 WL 7761498, at *6 (D. Minn. Dec. 12, 2012) (finding that an injunction was not in the public interest where the plaintiff did not make a showing that there had been a violation of law), *report and recommendation adopted*, 2013 WL 1104786 (D. Minn. Mar. 18, 2013).

### D.    Exhaustion

The State Defendants argue that injunctive relief would also be inappropriate because Mr. Hodges failed to exhaust his administrative remedies prior to seeking relief from the Court. Mr. Hodges vigorously disputes the State Defendants' argument, contending that administrative remedies were essentially made unavailable to him because

of how DOC officials handled his informal complaints and grievances. Because the Court has concluded that Mr. Hodges is not entitled to a preliminary injunction based on the discussion above, it is unnecessary to address the parties' disagreement regarding the exhaustion of administrative remedies at this time.

## IV.    Recommendation

For all the reasons discussed above, **IT IS HEREBY RECOMMENDED THAT** Plaintiff's motion for a preliminary injunction **[ECF No. 50]** be **DENIED**.

Date: October 23, 2020                    *s/Katherine Menendez*
                                          Katherine Menendez
                                          United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.