## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

DAVID LAURENCE HODGES,                     No. 20-cv-00090-WMW-KMM

                    Plaintiff,

v.                                         **REPORT AND**
                                           **RECOMMENDATION**

STATE OF MINNESOTA
DEPARTMENT OF CORRECTIONS, et
al.,

                    Defendants.

This matter is before the Court on Defendants' Motions for Summary Judgment. (Centurion Mot., ECF 115; DOC Mot., ECF 137). Defendants ask the Court to grant summary judgment and dismiss Mr. Hodges' claims because he cannot show any constitutional violation and they are entitled to qualified immunity. For the reasons below, the Court recommends that the motions be granted in part with respect to Mr. Hodges' federal constitutional claims. As for Mr. Hodges' state law claims, the Court recommends declining to exercise jurisdiction and remanding them to Ramsey County District Court.

## I.    Background

Plaintiff, David Laurence Hodges, is an inmate in the custody of the State of Minnesota Department of Corrections ("DOC"). He brings this case pursuant to 42 U.S.C. § 1983 for claims of Eighth Amendment deliberate indifference, both for the DOC's failure to protect him from an attack by another inmate and for inadequate

medical treatment in failing to refer him to an ophthalmologist after the fight. Mr. Hodges also asserts a First Amendment retaliation claim and state-law claims for negligence and medical malpractice.

### A. Procedural Posture

Mr. Hodges filed his first Complaint (ECF 1) on January 7, 2020, bringing claims against DOC Defendants,[1] Centurion of Minnesota, L.L.C. ("Centurion"), a healthcare company contracted to provide medical care to DOC inmates, and Dr. Darryl Quiram, a Centurion medical provider employee. On October 6, 2020, Mr. Hodges filed his First Amended Complaint (ECF 96), adding as defendants Gene O. Olson and Collin Gau, both DOC employees, and Dr. Michelle E. Taylor and Dr. Joseph Mork, optometrists working as contractors for Centurion. Since the filing of the Amended Complaint, the following Defendants have been dismissed from the lawsuit: Dr. Michelle E. Taylor (ECF 173); Dr. Joseph Mork (ECF 113); and Dr. Darryl Quiram (ECF 174).[2]

### B. Prison Altercations and Investigation

The following discussion addresses the factual background relevant to Mr. Hodges' claim that the DOC Defendants violated his Eighth Amendment rights by failing to protect him from an attack by another incarcerated person.

---

[1]     The "DOC Defendants" currently include the State of Minnesota Department of Corrections and several DOC officials: Ashlee E. Berts, Derek L. Gunderson, Cathy Nielson, James. M. Olson, Stacy R. Olson, Gene O. Olson, Collin Gau, and Jeffrey T. Titus.

[2]     Although Mr. Hodges originally sued Nanette Larson, when he filed his Amended Complaint on October 6, 2020, he did not name her as a Defendant. (ECF 96.)

### First Altercation

On September 18, 2018, while Mr. Hodges was incarcerated at the Minnesota Correctional Facility in Rush City, Minnesota ("MCF-Rush City"), Courtney Osgood, another inmate, entered Mr. Hodges' cell with a homemade knife and attacked Mr. Hodges. (Am. Compl. ¶ 18, ECF 96; Hodges Decl. (Apr. 3, 2021) ("4/3/21 Hodges Decl.") ¶ 4, ECF 160.[3]) Mr. Osgood tore out Mr. Hodges' dreadlocks. Attempting to defend himself, Mr. Hodges grabbed his "hot pot,"[4] which was full of heated water, and threw it on Mr. Osgood, burning him and causing him to flee. (Am. Compl. ¶ 18; 4/3/21 Hodges Decl. ¶ 4.) Staff later documented the incident and found that Mr. Hodges now had short hair and Mr. Osgood had burns on his head, neck, and back. (ECF 139, Ex. 6 at 6.)

Mr. Hodges became concerned for his safety after learning that Mr. Osgood was part of a gang and that they were planning retaliation. (Am. Compl. ¶ 20; 4/3/21 Hodges Decl. ¶ 3.) To try and protect himself, Mr. Hodges arranged for his significant other, Ella Washington, to contact the prison and inform them of the fight and communicate concerns about his safety. (Am. Compl. ¶ 21; 4/3/21 Hodges Decl. ¶ 11.) On September 24, 2018, about a week after the fight, Ms. Washington called the prison and reported the

---

[3]    There are other declarations from Mr. Hodges filed on April 3, 2021 as part of the summary judgment record. (ECF 164, 165.) They are dated June 1, 2020, and August 3, 2020, respectively, and were previously submitted in connection with the motion for a preliminary injunction. (ECF 51, 84.)

[4]    A hot pot is a device that can be used to heat liquid. (*See* Gene Olson Dep. 16, 5–6, ECF 162-9; *see also* Am. Compl. ¶ 18.)

incident to Lieutenant Randy Erdman. (Am. Compl. ¶ 21; 4/3/21 Hodges Decl. ¶ 11.) She also sent an email to Warden Titus reporting the fight and stating that Mr. Hodges "still fears for his safety and his life." (Kushner Decl. (Apr. 3, 2021) ("4/3/21 Kushner Decl."), Ex. 1 at 6–7, ECF 162.) Mr. Hodges' sister also contacted the DOC reporting concerns about Mr. Hodges' safety in the aftermath of the September 18, 2018 fight. (*Id.*, Ex. 1 at 16.) Mr. Hodges did not personally report his safety concerns to anyone at the prison until after these reports.

### DOC Response

In response to Ms. Washington's call, Lt. Erdman wrote a summary report and reviewed camera footage of the cell. (4/3/21 Kushner Decl., Ex. 1 at 1.) The video showed that at 10:19 a.m. Mr. Hodges walks into his cell, followed shortly by Mr. Osgood. (*Id.*) After Mr. Osgood walked in, the door shut, and paper covering the window prevented Lt. Erdman from being able to see inside. (*Id.*) About two minutes later Mr. Osgood left the cell. (*Id.*) Lt. Erdman then ordered both men to be placed in segregation. (*Id.*) Mr. Osgood also had "a large burn mark on his back between his shoulder blades." (*Id.*)

On September 25, 2018, Lieutenant Gene Olson and Sergeant Michael Kunze followed up on Lt. Erdman's report and served Mr. Hodges with disciplinary charges for the altercation. (Am. Compl. ¶ 21; 4/3/21 Kushner Decl., Ex. 1 at 3; Gene Olson Dep. at 11–12.) Lt. Olson also questioned Mr. Hodges about the alleged shank, which Mr. Hodges said he was able to get away from Mr. Osgood, but he later discarded. (4/3/21 Kushner Decl., Ex. 1 at 3.) Mr. Hodges also described the fight and his fears of

future retaliation, and requested to be moved out of the unit, away from Mr. Osgood and his friends. (Am. Compl. ¶ 21–22; 4/3/21 Hodges Decl. ¶ 8.) In their discussion, Mr. Hodges told Lt. Olson, "You need to move me out of here because things in 3 North are not done yet. It's gonna get really ugly in there and I just want out of here." (4/3/21 Kushner Decl., Ex. 1 at 3.)[5]

Lt. Olson also requested to speak with Mr. Osgood, who initially refused to talk. (Gene Olson Dep. 13.) However, Lt. Olson later approached Mr. Osgood again, and Mr. Osgood told him that Mr. Hodges had wanted to fight him, so they went to his room, shut the door, and fought. (*Id.*) Mr. Osgood said that "as far as he was concerned the issue was dead." (*Id.*) After interviewing both men, Lt. Olson ordered a search for the weapon, but was unable to locate it. (*Id.* at 14.)

Though Mr. Hodges asked to be relocated, the DOC did not move him to another unit in MCF-Rush City or to another prison. (Am. Compl. ¶ 22.) Instead, Mr. Hodges was sentenced to 40 days in segregation as punishment for fighting, while Mr. Osgood was sentenced to 20 days. (4/3/21 Kushner Decl., Ex. 1 at 38–40; *see also* Am. Compl. ¶ 23 (regarding length of Osgood's disciplinary sentence).) During his time in segregation, Mr. Hodges and his family contacted DOC officials expressing concerns for Mr. Hodges' safety and requesting that he be transferred. (4/3/21 Hodges Decl. ¶¶ 8–9; 4/3/21 Kushner

---

[5]    Mr. Hodges also testifies that he "sent numerous written kites to [the] Defendants" about his concerns for his safety, but claims that this documentation was not available because DOC officials took his paperwork when he was eventually transferred out of MCF-Rush City. (4/3/21 Hodges Decl. ¶ 9.) The DOC has no record of these kites in its system.

Decl., Ex. 1 at 13–16 (emails from late September to early October 2018); *Id.*, Ex. 1 at 5 (letter from Plaintiff's sister); Am. Compl. ¶ 24.)

### Incompatibility Committee Review

DOC has an Offender Incompatibility policy which is used when officials believe there is a possible incompatibility between offenders. (4/3/21 Kushner Decl., Ex. 1at 21–22.) The matter is submitted to each facility's incompatibility committee, which can recommend a finding of incompatibility between specific offenders and order one of them transferred to another facility if approved by the Capacity Manager. (*Id.*; *see also id.*, Ex. 2, Berts Dep. 20–26 (regarding general recommendation process and manager approval)). The committee is made up of various DOC staff members serving in different roles throughout the prison and meets about once a week to discuss cases. (Berts Dep. 20–26.) The committee typically addresses anywhere from zero to seven cases at these meetings. (*Id.* at 21–25.)

On September 26, 2018, MCF-Rush City's incompatibility committee met to discuss pending cases, including Mr. Hodges'. (Am. Compl. ¶ 28; Berts Dep. 33.) Two members confirmed they sat on the committee at that time: Ashlee Berts was the committee chair, and Gene Olson was a panel member. A third, Defendant Derek Gunderson, believes he was on the incompatibility committee as well, but his recollection is not as certain. (Berts Dep. 23, 32; Gene Olson Dep. 9; 4/3/21 Kushner Decl., Ex. 5, Gunderson Dep. 56.) When the committee found two inmates incompatible, it would provide a brief description of the altercation and a very brief explanation of why the recommendation was supported by the committee members. However, if the prisoners

were not determined to be incompatible and the committee recommended no action be taken, the committee did not generally keep any written records about its reasoning. (Berts Dep. 23–24.) Ms. Berts and Lt. Olson summarized the type of information the committee would review and the usual factors the committee considered in reaching a determination about whether to transfer a prisoner. These included reviewing incident reports, kites submitted by an inmate to a staff member, information obtained during disciplinary proceedings such as interviews with inmates, video review, and documentation. They would also take into account the severity and possible punishments for the altercation in determining whether two inmates are incompatible. (Berts Dep. 23; Gene Olson Dep. 19–21.)

The committee members who discussed Mr. Hodges' case are unable to recall all the details of their discussion or the specific factors they considered in making their decision in Mr. Hodges' case. (Berts Dep. 32; Gene Olson Dep. 19-21; Gunderson Dep. 56.) Though Lt. Olson's recollection of the committee's deliberations was not very specific, he recalled some details, and testified that the committee members unanimously found that Mr. Hodges and Mr. Osgood were not incompatible. (Gene Olson Dep. 19–21.) In describing the review, Lt. Olson stated:

> I don't remember the specifics of the discussion. I mean, we presented what was reported. We went over the incident report. It was a first-time incident between the two of them. A typical offender assault or a fight. And as far as I know the committee determined that it did not rise to the level of an incompatibility? … I can only recall from going around the table that I, as the discipline supervisor, presented the report. We discussed what both offenders told us. Based on the situation we had one offender Hodges saying that he felt like it was. We had the other offender saying that there

> wasn't. Typically, on a first-time incident that involves two guys we do not
> send that down.

(Gene Olson Dep. 20.) Lt. Olson explained that in his experience, nearly every offender involved in a fight requests to be transferred. Due to the sheer number of transfer requests, Lt. Olson typically requires some level of proof of allegations that a particular incident was especially serious, such as having a knife involved. (*Id.* at 22.)

Although no documentation is available detailing the incompatibility review meeting's specific findings or the factors considered in this case, and those who conducted the review do not recall those details, there is no dispute that the committee recommended "no action." (*Id.* at 21; Am. Compl. ¶ 28.) As explained below, the committee's conclusion that the two men could peacefully coexist in the same space turned out to be wrong.

### *Second Altercation*

Mr. Hodges was released from disciplinary segregation on November 3, 2018, and returned to a cell in the same living unit as Mr. Osgood. (Am. Compl. ¶ 35.) Just hours later, Mr. Osgood and another inmate attacked Mr. Hodges, throwing a cup of hot water mixed with what is believed to be capsaicin cream[6] on Mr. Hodges' face before repeatedly striking his face and body. (*Id.* ¶ 36; Kushner Decl., Ex. 1 at 28–37.) Mr. Hodges was taken to the emergency room for treatment of his injuries. (Am. Compl.

---

[6]    Capsaicin is the active chemical which gives chili peppers their spice. Capsaicin cream is available as an over-the-counter topical ointment advertised to help reduce specific types of pain, or more commonly, arthritic pain. *https://www.mayoclinic.org/drugs-supplements/capsaicin-topical-route/description/drg-20062561.*

¶ 37; Kushner Decl. (June 23, 2020) ("6/23/20 Kushner Decl."), Ex. 1 ("ER Records"), ECF No. 166.[7])

The incompatibility committee later met and determined there was now evidence to support a finding of incompatibility between Mr. Hodges and Mr. Osgood as this was the second incident and both parties stated the issues would continue. (Am. Compl. ¶ 40; 4/3/21 Kushner Decl., Ex. 1 at 17–20). Mr. Hodges was transferred to MCF-Stillwater on November 13, 2018. (Am. Compl. ¶ 40.)

### C. Medical Treatment

The following discussion is focused on Mr. Hodges' complaints after the November 3rd attack regarding his eyesight and the nature of the care he received. It is undisputed that Mr. Hodges suffered other injuries from the attack, but they do not form the basis of his deliberate-indifference claim regarding his medical needs. Accordingly, the Court does not detail these injuries other than to note that they were serious. (*See generally* ER Records.)

#### *Emergency Room Treatment*

After the attack, Mr. Hodges was taken to the Fairview Lakes Emergency Department. (ER Records at 1; Am. Compl. ¶ 37). He suffered second-degree burns to his chest, face, and the inside of his eyes. (Am. Compl. ¶ 38). He also complained of blurred vision, a burning sensation in his eyes (primarily his left, where he had difficulty seeing

---

[7]    The documents at docket entry 166 are identical to those at docket entry 53. The earlier of these was submitted by Plaintiff's counsel in connection with Mr. Hodges' motion for a preliminary injunction.

anything other than light), swelling around his eyes, and other symptoms. (ER Records 1, 11.) The ER physician, Dr. Scott Moses, irrigated Mr. Hodges' eyes and consulted with an ophthalmologist, Dr. Eichler. (*Id.* at 7–8.) On Dr. Eichler's recommendation, Dr. Moses prescribed TobraDex ointment and follow-up the following Monday at an eye clinic; he did not specifically refer Mr. Hodges to an ophthalmologist. (*Id.* at 8; 6/23/20 Kushner Decl., Ex. 2 ("DOC Med. Records") at 18 ("Re-eval by Monday in eye clinic.").) Dr. Moses discharged Mr. Hodges the same day with care instructions for a corneal abrasion. (DOC Med. Records 18–29.)

### *Subsequent Medical Care*

Since his release from the hospital, Mr. Hodges has been seen by medical professionals on numerous occasions, both for eye care and general medical treatment. This has included at least 49 nursing encounters, 29 non-optometry medical encounters, and optometry appointments on November 9, 2018; December 13, 2018; January 24, 2019; February 7, 2019 (rescheduled); February 14, 2019; March 7, 2019; April 18, 2019; January 31, 2020; July 13, 2020; and December 2, 2020. (Wiener Aff., Exs. 10–12, ECF No. 139; Novak Aff., Ex. A ("Dec. 2 Exam"), ECF No. 120). He also spoke with medical providers about his eyes on November 5, 2018; January 7, 2019; April 5, 2019; October 10, 2019; and had a no-show appointment with an eye doctor on October 22, 2019. (Novak Aff., Ex. D ("Weingarden Report") at 3-4, ECF No. 75).

*Optometry Appointments*[8]

On his November 9, 2018 appointment, six days after the attack, Mr. Hodges given a full exam by an optometrist and was noted as having no retinal tears or detachments, but he did have a subconjunctival hemorrhage and a mildly elevated intraocular eye pressure. It was recommended that he return in two months. At that time, his vision was corrected to 20/20 in his right eye, and 20/30 in his left. (Dec. 2 Exam at 2.)

He returned about two months later, on December 13, 2018, and his vision in his left eye had improved to 20/25, but his eye pressure remained elevated at 28 mmHg[9] in each eye. (*Id.*) The optometrist recommended he return in a month, which he did on January 24, 2019. He complained of flashes 10-12 times per day in his left eye. No retinal breaks or detachments were noted, but his eye pressure remained elevated at 26 and 28 mmHg in his right and left eyes respectively. He was prescribed Xalatan eye drops to treat the pressure and scheduled to return in 2-4 weeks. (*Id.*)

---

[8]     For ease of reference, here the Court cites primarily to the summary of care Mr. Hodges received for his eyes that is provided in the December 2, 2020 medical note from Dr. Tyler Maxon, the most recent optometrist to have seen Mr. Hodges. Dr. Maxon's summary is consistent with the Court's review of the medical records that were submitted in connection with the motion for a preliminary injunction and re-submitted or referenced as part of the summary-judgment record.

[9]     In her deposition, Dr. Taylor noted that elevated eye pressure can cause permanent damage if left untreated over a long period of time (generally years), and that she would be happy with a pressure of 20 and would feel a need to treat right away if it rose to 30. (Novak Aff., Ex. B ("Taylor Dep.") at 21 (long-term damage), 23 (bad eye pressure), 33 (good eye pressure).)

On February 24, 2019, about three weeks later, he returned for his next appointment, but had only used the drops for about three days. His eye pressures had dropped to 26 and 24 mmHg in his right and left eyes respectively. (*Id.*) He was once again recommended to return in two weeks, and encouraged to use the drops.

On March 7, 2019, at his next appointment, Mr. Hodges complained the drops made his eyes red. His eye pressures were at 24 and 14 mmHg, and he was discontinued on Xalatan and started on Timolol. (*Id.*)

He returned on April 18, 2019 for another pressure check, where he reported good tolerance of the new drops. His pressure had dropped to 20 mmHg in each eye, and the doctor recommended he continue the use of Timolol and referred him to a follow-up in two months. (*Id.* at 3.)

He was scheduled for October 22, 2019 but was a no-show.[10] (*Id.*) His next appointment was for an annual exam on January 31, 2020. He complained of blurriness in his left eye and floaters. His vision was corrected to 20/20 in each eye. No diabetic retinopathy, retinal breaks, detachments, or floaters were noted. His eye pressures measured 16 and 23 mmHg in his right and left eyes respectively. He was recommended to return in four months for a pressure check and visual field test, and issued glasses. (*Id.*)

His next appointment was July 13, 2020, where his eye pressure had changed to 18 and 20 mmHg in his right and left eyes respectively. The visual field test revealed inferior

---

[10]    Mr. Hodges explains that he did not find out about the October 22, 2019 appointment until the following day, when he was given a pass. (Hodges Reply Decl. (Aug. 3, 2020) ("8/3/20 Hodges Decl.") ¶ 9, ECF 165.)

arcuate defects consistent with glaucoma, and he was restarted on Xalatan and recommended to return in six months. (*Id.*)

### Most Recent Exam

Mr. Hodges' most recent documented optometry exam was on December 2, 2020 with Dr. Tyler Maxon. The report notes Mr. Hodges believed he was scheduled in order to get an ophthalmology referral, but the nurse later told Dr. Maxon she denied making any promises of a guaranteed referral. (*Id.*) Mr. Hodges continued to be treated for glaucoma, maintaining prescriptions for both Xalatan and Timolol. He reported good compliance with Xalatan, but denied taking Timolol, stating "nobody has given it to me." A records check showed the prescription remained active. (*Id.*)

The actual exam showed no corneal scarring or evidence of trauma and a normal structural appearance. No floaters were noted. His eye pressure was noted as being well controlled, and he was educated on the importance of using both eye drops to control his glaucoma, as well as to address the effects his uncontrolled diabetes might have on his vision. Mr. Maxon conducted several tests, including visual acuity and gonioscopy exams. (*Id.* at 3–4.)

Mr. Hodges also requested a referral to ophthalmology from Dr. Maxon. No referral was given, and Dr. Maxon explained that Mr. Hodges has been seen multiple times by optometrists and has no conditions that warrant an outside consultation. (*Id.* at 4.) In his notes, Dr. Maxon states:

> I find no direct evidence that Mr. Hodges' chemical injury to his eyes in 2018 has had any long-lasting consequences…. It is difficult for me to understand what Mr. Hodges is seeking because his complaints are not

consistent. He complains he wants his eye examined by ophthalmology
because he can't see. However, Mr. Hodges is corrected to 20/20- in his left
eye. Mr. Hodges then complains that he wants his floaters removed (was
multiple floaters at one point and now is one big floater) yet during his
dilated fundus exam I was unable to locate any significant floaters.
…
There is no clinical indication for an outside referral to ophthalmology for
this patient's 2018 ocular trauma…. I explained to the [sic] Mr. Hodges that
we typically don't remove a floater except under the rarest of occasions…
[and] that I was unable to locate any such floater that would be causing him
so much trouble.

(*Id.* at 4–5.)

### *Alleged Referral*

The DOC transferred Mr. Hodges to the Minnesota Correctional Facility in Moose

Lake ("MCF-Moose Lake") on August 31, 2019. (DOC Medical Records at 2.) Shortly

after he arrived at MCF-Moose Lake, on September 19, 2019, Mr. Hodges was seen by

Traci Rogers, a Nurse Practitioner, for a chronic type-2 diabetes checkup. (*Id.*)

Mr. Hodges complained about his eye problem and the medical record from the

appointment states: "I am going to put in a referral for him to be seen in ophthalmology

today in regard to this, and it sounds like he is on or has been on some eyedrops and we

will need renewal of that at some time." (*Id.*) Although these typed notes mention an

ophthalmology referral, in her handwritten order following the appointment, Nurse

Rogers wrote: "referral to ~~opthalm~~ optometry…" and the word "ERROR" is written

above the crossed-out portion of ophthalmology. (*Id.* at 10.)

### Expert Opinions

Both sides have submitted expert opinions regarding the eye care Mr. Hodges since November 3, 2018.[11] Plaintiff's expert, Dr. Michael Lee, is a Board-Certified Ophthalmologist. He indicates generally that he was provided insufficient information to give an opinion regarding the nature and extent of Mr. Hodges' eye injuries. (Lee Decl. ¶ 10, ECF No. 52). However, Dr. Lee noted in his June 28, 2020 opinion that Mr. Hodges needed a visual-field test to evaluate his complaints of vision problems, a pressure check, an optical coherence tomography ("OCT") test, and a thorough examination for scar tissue and other injuries. (*Id.* ¶¶ 10–11.) Dr. Lee states: "There is a substantial chance that a proper examination of Mr. Hodges would lead to an opportunity to correct his injury. There is also a substantial possibility that the delay in proper evaluation and treatment has prevented or reduced the chances of correcting or alleviating Mr. Hodges' injury." (*Id.* ¶ 12.) Dr. Lee further opined that because optometry appointments "were not successful in identifying and correcting the problem, the failure to refer Mr. Hodges to an ophthalmologist for a thorough examination is professionally inexcusable." (*Id.* ¶ 13.)

Defense expert, Dr. Alan Weingarden, also a Board-Certified Ophthalmologist, disagreed with certain conclusions drawn by Dr. Lee. For example, Dr. Weingarden indicated that the OCT test Dr. Lee recommended would not need to have been

---

[11]    The parties reference these expert reports in their summary judgment briefing. (*See* ECF 117 at 8–9; ECF 138 at 33; ECF 159 at 17–19.) The Court notes that these reports were submitted previously in connection with the motion for a preliminary injunction, and no new expert evidence has been provided as part of the summary judgment record.

performed during the immediate aftermath of Mr. Hodges' chemical-burn injuries.
Dr. Weingarden stated that the OCT test "would be in keeping with an evaluation for
glaucoma, which ultimately would be done in approximately one-year time interval" in
optometry. (Weingarden Report at 4; see also *id.* at 5 ("Regarding following the
glaucoma, that would be appropriate care for an optometrist and at some future point,
visual fields and optical coherence tomographies would have been done probably at a
one-year interval.").) Mr. Hodges was, in Dr. Weingarden's view, "not in need of an
[OCT] or a visual field" test during the period immediately following the assault because
"[h]e had pressures which were returning to normal," and "[h]e had a cup-to-disc ratio
that was essentially slightly abnormal, but not severely abnormal…." (*Id.* at 4.)
Dr. Weingarden also opined that "[t]here is no need for an ophthalmologic referral on the
basis of the examinations done by the optometrist. They did not find anything that
required further intervention by an ophthalmologist. They did not find any scar tissue or
any damage to the cornea." (*Id.*) He believes that Mr. Hodges received treatment for his
eye problems that was consistent with the applicable standard of care. (*Id.* at 5.)

In a reply declaration, Dr. Lee indicated that the optometrist's notes from the July
2020 appointment show "Mr. Hodges' visual fields were abnormal." (Lee Reply Decl. ¶
3). Dr. Lee also opined that the medical records still show no OCT testing has been
performed. (*Id.* ¶ 4.) He agreed that an OCT test would not be necessary for a chemical
burn, but suggested the test should have been performed because Mr. Hodges may have
experienced blunt-force trauma during the assault. (*Id.*) Further, Dr. Lee agreed with the
defense suggestion that Mr. Hodges' "eye problems could be related to his diabetes." (*Id.*

¶ 6.) But Dr. Lee explains: "[t]his … is another reason why he needs an OCT to determine if there is swelling of the retina. This cannot be seen with a regular eye exam." (*Id.*) In addition to the OCT test, Dr. Lee stated that Mr. Hodges should have received a gonioscopy exam to test for angle recession (which could explain his high pressures), and a pachymetry test. (*Id.* ¶ 5.) Dr. Lee agreed that optometrists can perform these tests and evaluate Mr. Hodges' eye injuries, but he opined that a thorough evaluation should have been performed within days of the injury. (*Id.* ¶ 7.) Dr. Lee opined that "the applicable standard of professional care requires Mr. Hodges receive a thorough evaluation by a qualified eye care provider with the necessary minimum testing." (*Id.*)

## II.    Summary Judgment Standard

Summary judgment is appropriate when, drawing all reasonable inferences in favor of the nonmoving party, the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party must demonstrate the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 322. When the moving party properly supports a motion for summary judgment, the nonmoving party must present admissible evidence showing that specific facts exist creating a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Wingate Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

## III.    Deliberate Indifference to Safety Claim

The DOC Defendants assert that they are entitled to summary judgment on Mr. Hodges' Eighth Amendment claim that they failed to protect him from Osgood's

November 2018 assault because the undisputed evidence shows that they responded reasonably to the safety concerns that were raised after the September 2018 fight. Mr. Hodges contends that summary judgment is unwarranted on this claim because a reasonable jury could conclude that the DOC Defendants chose not to take any action to protect Mr. Hodges after the initial incident, prioritizing expediency over his safety.

This case involves a troubling absence of documentation of the basis for the DOC Defendants' ultimately incorrect determination that Mr. Hodges and Mr. Osgood did not need to be separated after their September 2018 altercation. Notwithstanding this concerning aspect of the record and the imperfect memories of the Defendants who made that determination, based on the evidence before the Court, a reasonable jury could not find that the Defendants were deliberately indifferent to Mr. Hodges' safety. The evidence simply does not support an inference that any DOC Defendant had the subjectively culpable mindset necessary to sustain an Eighth Amendment claim under existing precedent.

### A. Legal Standard

Prison officials must "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). Under the Eighth Amendment's prohibition against cruel and unusual punishment, this includes "a duty … to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Schoelch v. Mitchell*, 625 F.3d 1041, 1046 (8th Cir. 2010) (same).

An incarcerated person's claim that prison officials failed to protect him from harm in violation of the Eighth Amendment is judged by a two-prong test. First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. This element is judged by an objective standard. *Id.*

The second prong is subjective. *Id.* at 837–38. Under the subjective element of a failure-to-protect claim, the plaintiff must prove that a prison official acted with deliberate indifference to the substantial risk of serious harm. *Id.* at 834; *Young v. Selk*, 508 F.3d 868, 873 (2007). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837 (emphasis added). "In contrast to negligence, deliberate indifference requires a highly culpable state of mind approaching actual intent." *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017) (internal quotation omitted). The standard is analogous to criminal recklessness. *Id.* Under this standard, prison officials "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. However, the plaintiff is not required to "show that the officials acted or failed to act believing that harm actually would befall the prisoner; it is enough that the officials acted or failed to act despite their knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. The factfinder may conclude a prison official had the requisite knowledge through circumstantial evidence, the very fact that the risk was obvious, or if the risk was

longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the evidence suggests the official 'must have known' about it. *Id.* at 842-83.

### B. Analysis[12]

The DOC Defendants do not argue that they are entitled to summary judgment on the objective prong of Mr. Hodges' failure to protect claim—that he was incarcerated under conditions posing a substantial risk of serious harm. Instead, focusing on their response to the reports they received about concerns for Mr. Hodges' safety, the DOC Defendants contend that the evidence here would not allow a reasonable jury to find that any of them was deliberately indifferent to a substantial risk of harm. (DOC Defs.' Mem. at 16–20, ECF No. 138.) Viewing the evidence in the light most favorable to Mr. Hodges, and considering the reasonable inferences that can be drawn from that evidence, the Court agrees that the DOC Defendants are entitled to summary judgment on this claim.

The undisputed evidence shows that the DOC Defendants investigated the circumstances of the first fight once they were notified, considered the matter at a meeting of the incompatibility review committee, and the committee concluded that the circumstances did not warrant separation of Mr. Hodges and Mr. Osgood. Promptly after Ms. Washington reported the September 2018 altercation and said she was concerned about Mr. Hodges' safety, Lt. Erdman reviewed video footage and confirmed that

---

[12]    The DOC Defendants have also raised the defense of qualified immunity in their motion for summary judgment. Since the Court has concluded that the DOC Defendants are entitled to summary judgment because the evidence would not allow a reasonably jury to find an Eighth Amendment violation, the Court does not address the question whether there was clearly established law at the time of the relevant events that would have put a reasonable official on notice that their conduct was unlawful.

Osgood had entered Mr. Hodges' cell on September 18th and left shortly thereafter. Next, Lt. Erdman observed that Hodges' hair was shorter, which was consistent with Ms. Washington's report that Osgood had pulled out Hodges' dreadlocks. Osgood also had a large burn mark on his back, which corresponded to Ms. Washington's report that Mr. Hodges had thrown hot water on him, causing burns.

Other DOC personnel continued investigating the incident, and Sgt. Kunze and Lt. Olson served notices on both Hodges and Osgood for their violation of several prison rules. At this point, Mr. Hodges told Sgt. Kunze and Lt. Olson about the September 18th incident from his own perspective. He said that Osgood was the aggressor, that the fight was part of an ongoing gang dispute, that Osgood tried to stab him with a shank inside his cell, that he wrestled the shank away from Osgood and later disposed of it, and that he wanted out of the living unit because he thought the feud was not over. Mr. Hodges also testifies that he told Sgt. Kunz and Lt. Olson that Osgood would be determined to kill him because of how the first fight ended. DOC officials were not able to confirm Mr. Hodges' report that Osgood had used a weapon, but they also did not definitively prove that the report about the shank was false. When Lt. Olson spoke with Mr. Osgood about the September 18th incident, Osgood stated that, from his perspective, the "the issue was dead."

After the September 18, 2018 fight, some (but not all) of the DOC Defendants were on the incompatibility review committee. Defendants Berts, Lt. Olson, and Gunderson had the responsibility to decide whether Mr. Hodges and Mr. Osgood should be separated based on the safety concerns raised by Ms. Washington, Mr. Hodges' family

members, and Mr. Hodges himself. Although it is undisputed that the incompatibility review committee reached a unanimous decision that no action was required, there are no records documenting the deliberations, and very limited memories about the proceedings. The participants in the committee's meeting largely did not recall specifics about the discussions that were had. And there is no documentation of the basis for the decision that was reached. But Lt. Olson provided some details in his deposition. He explained that the incompatibility committee's decision was based on the available evidence. He noted that this was a first-time incident between Mr. Osgood and Mr. Hodges, that Osgood said he considered the dispute to be put to rest, and that DOC officials were never able to corroborate Mr. Hodges' assertion that Osgood had used a weapon.

Viewed in the light most favorable to Mr. Hodges, a reasonable jury could conclude that the September 18th fight created a safety concern, but establishing a deliberate-indifference claim requires more. To survive summary judgment, a reasonable jury would have to be able to find that the defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that they drew that inference. *Farmer*, 511 U.S. at 837. Mr. Hodges does not identify any evidence in the record suggesting that any DOC Defendant had the "'highly culpable state of mind approaching actual intent'" necessary to prove an Eighth Amendment violation. *See Blair v. Bowersox*, 929 F.3d 981, 988 (8th Cir. 2019) (quoting *Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017)). True, to prove a defendant acted with deliberate indifference, Mr. Hodges need not point to defendants confessing that they knew Mr. Hodges was at serious risk, but did not care about his safety, or admitting that they chose not to act for

reasons unrelated to a substantial threat to his safety. Circumstantial evidence could suffice. *See Farmer*, 511 U.S. at 842 (explaining that "knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence"). But the circumstantial evidence here does not permit a reasonable inference that any DOC Defendant subjectively understood there was a substantial risk of serious harm. *See Wheatley v. Smith*, Civil No. 12-880 (DWF/AJB), 2014 WL 1207783, at *12 (D. Minn. Jan. 6, 2014) (finding that a defendant (Murphy) was entitled to summary judgment where there was "no evidence—either direct or circumstantial—that would allow a factfinder to infer that Murphy actually did know, (or actually did draw the inference), that Plaintiff was being exposed to a substantial risk of serious harm when Murphy (allegedly) unlocked Plaintiff's cell"). Instead the unrebutted evidence shows that the DOC officials tasked with deciding whether Mr. Hodges and Mr. Osgood were incompatible thought the two did not need to be separated. It cannot be that the simple, and sad, fact that this assessment was wrong evidences deliberate indifference.

Mr. Hodges asserts that the decision to take no action to protect him after the first fight was even less defensible than the conduct of the defendants who were denied summary judgment in *Young v. Selk*, 508 F.3d 868 (8th Cir. 2007).[13] His reliance on *Young*, however, is not particularly persuasive. Mr. Young was incarcerated at MCF-Rush City, and reported to the defendants, Sergeant Selk and Sergeant Coolidge, that his

---

[13]    Pl.'s Resp. to DOC Mot. at 23–24, ECF No. 159.

new cell mate was acting deranged, had threatened him for no apparent reason, and that

he had an urgent safety concern. *Id.* at 870–71. The evidence showed that, in response to

Mr. Young's first report, Sergeant Coolidge "blew him off," telling Mr. Young to talk to

someone else about the problem. When Young reported the matter to Sergeant Selk the

following day, Sergeant Selk "did not take any action." *Id.* at 871. To suggest that the

DOC Defendants responded similarly to learning of the September 18th fight—

essentially that they "did nothing"—is a distortion of the record. As explained above, the

DOC Defendants investigated the circumstances of the fight, reviewed video evidence,

interviewed the participants, and took Mr. Hodges' request for a transfer to the

incompatibility review committee. When defendants respond reasonably to safety risks,

they are not liable under the Eighth Amendment, "even if the harm ultimately was not

averted." *Farmer*, 511 U.S. at 844.

Focusing on the absence of documentation of the reasoning for the incompatibility

review committee's decision and the DOC Defendants' limited memory of their

discussion at the committee's meeting, Mr. Hodges characterizes the committee's process

as a "sham." (Pl.'s Resp. to DOC Mot. at 22, ECF No. 159.) He argues that "[b]ased on

the lack of any record or specific recollections of the incompatibility committee's

decision, it is reasonable to infer that they lacked any reasonable basis for their decision

or perhaps did not even engage in any deliberations." (*Id.* at 25.) The Court disagrees—a

reasonable jury could not conclude from the evidence here that the DOC Defendants had

no basis for their decision or engaged in no deliberations regarding Mr. Hodges' request

to be separated from Osgood. Of course, it would be wise for prison officials to better

document the reasons for a decision like the one made after the September 2018 fight, and there is no denying that the record here is lacking documentation. However, even though Defendants Berts, Lt. Olson, and Gunderson could not recall the committee's meeting in detail, Berts and Olson both testified they were present for it. Further, Lt. Olson testified that the meeting was in person and that Mr. Hodges' concerns were, in fact, presented. He testified that the reports DOC personnel received were addressed and that he presented the incident report. Finally, he explained that the committee reached the decision that no action was necessary because this was a first-time incident and only Mr. Hodges believed the feud would continue, whereas Osgood stated the dispute was over. Consistent with Lt. Olson's recollection, Ms. Berts testified about the types of evidence generally considered during the incompatibility meetings. This evidence is unrebutted, and Mr. Hodges does not point to any evidence that would allow a reasonable jury to infer that the process was a sham simply because memories have faded and no notes exist.

At oral argument, Mr. Hodges suggested that the evidence shows the DOC Defendants denied his request to be relocated because of a prioritization of resources over his safety. But Mr. Hodges does not point to any evidence supporting an inference that such a prioritization motivated the committee's decision that no action was needed after the September 2018 fight. In fact, Warden Titus testified that MCF-Rush City cannot simply transfer an inmate based on his own preferences but will do so when there is true incompatibility. (*See* Titus Dep. at 55; Titus Decl. ¶¶ 3–4.) He also explained that attempting to separate two individuals who are truly a risk to one another within the

25

MCF-Rush City facility is not a workable solution because the facility presents too many opportunities for the individuals to cross paths. (Titus Dep. at 67–70.) Moreover, Mr. Hodges' argument is undermined by the reality that, after Osgood's November 2018 attack proved, in hindsight, that the incompatibility review committee made the wrong decision, the DOC transferred him to MCF-Stillwater. In other words, when there was substantial information indicating that Mr. Hodges and Mr. Osgood could not peacefully coexist, the DOC responded to that obvious safety issue irrespective of any burden on the Department's resources.

Finally, Mr. Hodges appears to argue that based on the information they had, the DOC Defendants should have, at a minimum, placed Mr. Hodges in a different living unit, or otherwise taken steps to separate him from Osgood within the MCF-Rush City facility. However, "[s]imply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the jailers did all they could have, but whether they did all the Constitution requires." *Rellergert ex rel. Rellergert v. Cape Girardeau Cty., Mo.*, 924 F.2d 794, 797 (8th Cir. 1991). Moreover, the fact remains that the record evidence does not support a finding that any DOC Defendant believed returning Mr. Hodges to his living unit after a period of protective custody presented a substantial risk of serious harm from Osgood. *See Farmer*, 511 U.S. at 844 ("Prison officials charged with deliberate indifference might show … that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."); *cf. Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998) (rejecting the district court's conclusion that it was "unreasonable" for the

defendant not to separate the plaintiff and his eventual attacker and "immediately search them and their cells for weapons" after the defendant received an anonymous tip because this would impose a negligence standard on the deliberate-indifference claim).[14]

For these reasons, the Court concludes that the DOC Defendants are entitled to summary judgment on Mr. Hodges' Eighth Amendment failure-to-protect claim.[15]

## IV.  Deliberate Indifference to a Serious Medical Need

The DOC Defendants and Centurion seek summary judgment on Mr. Hodges' Eighth Amendment claim that they were deliberately indifferent to his serious medical needs. As explained below, the Court recommends that the motions be granted.

---

[14]  The Court acknowledges that the facts in *Jackson* differ in an important way from the situation in this case, but the Court nonetheless finds the *Jackson* court's reasoning to be instructive. In *Jackson*, unlike here, both the plaintiff and his eventual attacker denied having a problem with the other. 140 F.3d at 1152. But, like the prison official defendant in *Jackson*, the DOC Defendants "promptly investigated" the potential safety risk facing them and determined that the alleged problem between two inmates involved did not require the action that the plaintiff claimed was necessary to avoid liability for a deliberate indifference claim. *Id.* As in *Jackson*, the DOC Defendants' alleged "failure to take additional security measures, even if arguably negligent, cannot constitute reckless disregard of a known risk." *Id.* at 1152–53.

[15]  The Court's conclusion that the DOC Defendants are entitled to summary judgment on Mr. Hodges' Eighth Amendment failure-to-protect claim does not mean that what happened to him is acceptable. Although his claim cannot be judged through the lens of hindsight, through such a lens the decision the defendants made tragically, if not deliberately, placed Mr. Hodges in harm's way. The Court hopes that, if it has not done so already, the DOC will use the lessons of Mr. Hodges' case to review its incompatibility-review process and determine where improvements can be made to reduce the chances that other prisoners endure a similar fate.

### A. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429, U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). This indifference can be manifested by prison doctors failing to properly treat their patients, prison guards intentionally delaying or denying access to medical care, or by intentional interference with prescribed medical care. *Id*. at 104–05. However, the Supreme Court also makes clear that "[not] every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id*. To be a constitutional violation, the denial of care must be so egregious that it becomes "repugnant to the conscience of mankind" or an "unnecessary and wanton infliction of pain." *Id.* at 105–06.

The standard for a medical indifference claim is similar to that for a failure-to-protect claim, with both an objective and subjective element. To survive summary judgment, Mr. Hodges must show "(1) an objectively serious medical need, and (2) that the defendant knew of and disregarded that need." *Redmond v. Kosinski*, 999 F.3d 1116, 1120 (8th Cir. 2021) (citation omitted) (*Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)).

Claims of deliberate indifference to medical needs "amount to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily

28

recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F. 3d 778, 784 (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) (internal quotations omitted)).

An Eighth Amendment violation is shown where "prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). Finally, "medical treatment may so deviate from the applicable standard of care as to evidence a physician's deliberate indifference." *Redmond*, 999 F.3d at 1120 (quoting *Moore v. Duffy*, 255 F.3d 543 (8th Cir. 2001))

### B. Analysis

The DOC Defendants argue that Mr. Hodges has failed to exhaust his administrative remedies with respect to this deliberate indifference claim. They also argue that even if they are not entitled to summary judgment on the question of exhaustion, Mr. Hodges' deliberate indifference claim fails on its merits. Centurion similarly argues that Mr. Hodges failed to point to evidence that creates a genuine dispute of material fact from which a reasonable jury could conclude that Centurion was deliberately indifferent to his serious medical needs. Mr. Hodges argues that the evidence supports his deliberate indifference claim for the following reasons: (1) the emergency room physician who saw him after the November 2018 attack and a nurse practitioner at MCF-Moose Lake referred him to an ophthalmologist, and the defendants have never sent him to see a specialist for evaluation and treatment; and (2) the defendants delayed conducting required testing, including a visual acuity test, and failed to perform necessary

tests, including an optical coherence tomography ("OCT") test and a pachymetry test.
Finally, Mr. Hodges appears to take the position that the evidence indicates the overall
follow-up treatment he received was grossly inadequate. For the reasons that follow, the
Court concludes that there is no genuine issue of material fact requiring a trial on the
claim that the Defendants were deliberately indifferent to Mr. Hodges' serious medical
needs.[16]

### Ophthalmology Referral

A reasonable jury could not find in Mr. Hodges' favor on his claim that medical
providers have twice indicated he needs to be seen by an ophthalmologist and the
defendants deliberately disregarded those referrals. Viewed in the light most favorable to
Plaintiff, the undisputed evidence in the record does not support a finding that either the
emergency room physician who saw Mr. Hodges after the November 2018 attack or the
nurse practitioner who saw him after he arrived at MCF-Moose Lake found that
evaluation by an ophthalmologist was necessary.

First, the evidence shows that the emergency room physician, Dr. Moses, spoke
with Dr. Eichler, an ophthalmologist, who recommended Mr. Hodges be treated with
TobraDex, which was prescribed. Although Mr. Hodges alleges that Dr. Eichler
recommended a follow-up with an ophthalmologist, the medical records reflect that
Dr. Eichler recommended only that there be a follow-up appointment. Dr. Moses made a
referral to an eye clinic for the following Monday; there was no referral to an

---

[16]    Because the Court reaches this conclusion on the underlying merits of the claim, it
does not address the exhaustion issue raised by the DOC Defendants.

ophthalmologist. Even viewing this evidence in the light most favorable to Mr. Hodges, a reasonable jury could not conclude that Dr. Moses ordered follow-up with an ophthalmologist, and it would be unreasonable for a fact-finder to determine that any DOC Defendant or Centurion provider disregarded such instructions.

Similarly, with respect to Mr. Hodges' September 19, 2019 encounter with Nurse Rogers at MCF-Moose Lake, the evidence does not support Mr. Hodges' claim that he was referred to ophthalmology. True, Nurse Rogers' typed note from the encounter states that she would "put in a referral for him to be seen in ophthalmology." But, as the Court previously explained in its opinion regarding Mr. Hodges' motion for a preliminary injunction (ECF 100 at 5, 13), Nurse Rogers ultimately referred him to optometry. Her handwritten notes from the encounter have the reference to ophthalmology crossed out and a notation that the reference was an error. Nurse Rogers testified that she used the wrong nomenclature due to her familiarity referring patients to ophthalmology in her previous job in a hospital emergency room.[17] Dr. Quiram also testified in his deposition that DOC patients are generally only referred to an ophthalmologist by an optometrist; unless there were emergency circumstances, a general practitioner would rely on the optometrist's opinion. (Novak Aff., Ex. A, Quiram Dep. at 27, ECF 69.) From this evidentiary record, a jury could not reasonably conclude that Nurse Rogers actually made a referral to ophthalmology or that the defendants deliberately disregarded such a referral as part of Mr. Hodges' treatment plan.

---

[17]     Dr. Taylor, one of Mr. Hodges' former optometrists, notes that hospitals typically employ only ophthalmologists, not optometrists.

### Testing

The Defendants are also entitled to summary judgment on Mr. Hodges' claim that the defendants showed deliberate indifference to his serious medical needs by delaying a visual acuity test and entirely refusing to conduct other tests, including an OCT or pachymetry test. First, there is no evidence indicating that any of the DOC Defendants were directly involved in determining the proper treatment for Mr. Hodges' ongoing complaints regarding his eyes. The remaining DOC Defendants in this case are Ashlee Berts, Collin Gau, Derek Gunderson, Michael Kunze, Cathy Nielsen, Gene Olson, James Olson, Stacy Olson, and Jeffrey Titus. Of these, only James Olson is a medical provider, but there is no evidence in the record that he ever saw Mr. Hodges or that he has any involvement with treatment choices made by the medical staff or optometrists who did see Hodges. There is no indication that any of the other DOC Defendants were involved in the treatment decisions regarding testing of Mr. Hodges' eyes or any other aspect of his medical care. Under these circumstances, a reasonable jury could not find in Mr. Hodges' favor on his claim that the DOC Defendants were deliberately indifferent to his serious medical needs based on the testing that was conducted or omitted. *See Petersen v. Kaemingk*, 528 F. App'x 691, 691 (8th Cir. 2013) (per curiam) ("There is no evidence that the prison-official and nurse defendants were personally involved in the treatment decisions at issue, or that some defendants even knew of Petersen's medical problems"); *Toney v. Hakala*, No. 4:10-cv-2056-JAR, 2013 WL 5406448, at *21 (E.D. Mo. Sept. 25, 2013) (same, citing *Petersen*).

Moreover, the deliberate-indifference standard generally does not require prison officials to interfere with physicians' treatment decisions. The circumstances under which a visual acuity test, OCT, and pachymetry may be medically necessary for an individual with eyesight complaints are generally left to those with appropriate medical training, and prison officials' decisions to defer to treating providers' judgment do not necessarily make them liable for deliberate indifference. *See Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) ("The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision."); *Wheatley v. Smith*, Civil No. 12-880 (DWF/AJB), 2014 WL 1207800, at *21 (D. Minn. Jan. 6, 2014) (recognizing that there may be situations where a "a treating physician's orders were somehow plainly unsuitable for a prisoner's present medical needs, and following such orders could constitute deliberate indifference," but that "[i]n most cases … deferring to a treating physician cannot constitute deliberate indifference to a prisoner's serious medical needs"). Here, there is no evidence in the record suggesting that the DOC Defendants were deliberately indifferent to Mr. Hodges' serious medical needs by failing to intervene and instruct his treating optometrists to perform any test that they did not conduct on their own.

Nor does the evidence support Mr. Hodges' claim that any Centurion provider was deliberately indifferent to his serious medical needs because of delaying or failing to conduct specific testing. The undisputed evidence shows that the Centurion providers who saw Mr. Hodges were not themselves optometrists, made referrals to optometry when they believed such referrals were warranted, and did not make determinations about

33

the specific eye tests that would be performed. (Quiram Dep. at 57 (explaining that Dr. Quiram relies on optometrists to determine what tests are necessary).) Mr. Hodges has not identified any evidence in the record from which a reasonable jury could conclude that a Centurion provider was responsible for deciding the specific eye tests he should have received to address the aftermath of the November 2018 assault or his ongoing complaints about his vision problems.

In addition, with respect to Mr. Hodges' suggestion that his constitutional rights have been violated by delayed testing, the Eighth Circuit has held that where a medical deliberate-indifference claim is "based on a delay in treatment, we measure the objective serious of the deprivation … by reference to the effect of delay in treatment." *Jackson v. Riebold*, 815 F.3d 1114, 1119 (8th Cir. 2016) (cleaned up). In order to avoid summary judgment, an inmate asserting undue treatment delay rising to a constitutional deprivation "must produce medical evidence to establish that the delay had a detrimental effect." *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir.2006). "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Jackson v. Riebold*, 815 F.3d at 1119–20 (internal quotation marks omitted).

Mr. Hodges' expert witness, Dr. Lee, opined in a May 26, 2020 declaration that Mr. Hodges that a thorough examination would include a "visual field test and peripheral vision check," OCT, and other tests. He also states that there is a "substantial possibility that the delay in proper evaluation and treatment has prevented or reduced the chances of correcting or alleviating Mr. Hodges' injury." (5/26/20 Decl. of Dr. Lee ¶¶11–12,

ECF 52.) In an August 3, 2020 reply declaration concerning the motion for preliminary injunction, Dr. Lee offered additional opinions regarding the tests needed to evaluate Mr. Hodges' eye complaints and stated that "this necessary evaluation and testing should have been performed within days of the injury and still has yet to be performed after almost 20 months since Mr. Hodges' injury." (8/3/20 Decl. of Dr. Lee ¶¶ 3–7, ECF 83.) Mr. Hodges does not point to any medical evidence indicating that any detrimental effect has occurred as a result of the alleged delay in conducting a visual acuity test, or any other test.

Dr. Lee's declarations simply do not create a genuine issue for trial because they do not provide a basis for a reasonable jury to conclude that any failure to conduct testing in a timely manner has actually had a detrimental effect on Mr. Hodges' health.[18] Indeed, the evidence shows that Mr. Hodges has no corneal burns or scars, and that his corneal abrasion has been fully healed for some time. The evidence in the record further showed that his vision acuity improved after the November 3rd attack. During Mr. Hodges' most recent optometry appointment with Dr. Maxon on December 2, 2020, the medical records indicate that: a dilation exam did not identify any indication of floaters; there was no direct evidence of any long-lasting consequences from the chemical injury; vision in his

---

[18]     Dr. Lee's opinion that the standard of care required certain testing to be performed at any given time also says nothing about whether that standard of care would apply to a Centurion provider, such as Dr. Quiram, who is not an optometrist or ophthalmologist, but a general practitioner. Dr. Quiram's own testimony indicates that he makes referrals to optometry when a patient presents with eye complaints, and there is no evidence, including Dr. Lee's declarations, indicating that he was professionally required to order an visual acuity, OCT, pachymetry, or any other testing under the circumstances.

left eye is corrected to 20/20; and there is no clinical indication for an outside referral to ophthalmology for assessment of ocular trauma. Under these circumstances, the Defendants' motions for summary judgment should be granted to the extent Mr. Hodges claims his Eighth Amendment rights were violated by delay in conducting any specific testing.

### Follow-Up Treatment

To the extent Mr. Hodges otherwise claims that the DOC Defendants and Centurion violated his Eighth Amendment rights as a result of his eye care following the November 3rd assault, the Court concludes that a reasonable jury could not find that that the Defendants were deliberately indifferent to his serious medical needs. To the contrary, Mr. Hodges has received substantial medical care for his eyes since the second assault. He first received eye treatment in the emergency room immediately following the assault. He has since received follow-up care for his eye and other issues on many occasions. This follow-up care has included medical visits where he has spoken with providers regarding his eyes, many of which were with optometrists. Optometrists have examined his eyes in response to his complaints, prescribed medication to address eye pressure concerns, changed his prescription when the original medicine caused redness (even though it had been effectively reducing eye pressure), prescribed eyeglasses for his nearsightedness, and found adequate visual acuity in both eyes upon testing. Given the substantial medical care Mr. Hodges has received, the Court recommends granting Defendants' motions for summary judgment on this claim.

## V.    First Amendment Retaliation

Mr. Hodges next asserts a claim of retaliation for exercise of his First Amendment rights. He alleges that the DOC Defendants rejected his request to be transferred to another prison and placed him in the same living area as Mr. Osgood in retaliation for his repeated submission of kites and verbal grievances. He also contends that the DOC Defendants and Centurion provided substandard medical care and refused to refer him to an ophthalmologist as retaliation for that same protected conduct.[19]

### A.  Legal Standard

To prevail on a First Amendment Retaliation claim, a plaintiff must show "(1) that he engaged in a constitutionally protected activity; (2) that the defendant took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated in part by [plaintiff's] exercise of his constitutional rights." *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014) (citing *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).

---

[19]    The Court notes that its conclusions above that Mr. Hodges' Eighth Amendment rights were not violated by the decision to place him back into the same living unit occupied by Osgood or as a result of the medical care provided for his eyes do not foreclose a claim that those actions were taken in retaliation for exercise of his First Amendment rights. *See Santiago v. Blair*, 707 F.3d 984, 994 (8th Cir. 2013) (explaining that "'conduct that retaliates against the exercise of a constitutionally protected right ... is actionable even if the alleged retaliatory conduct does not itself rise to the level of a constitutional violation'") (quoting *Van Wyhe v. Reisch*, 581 F.3d 639, 658 (8th Cir. 2009)).

**B.  Analysis**

*DOC Defendants*

The DOC Defendants do not dispute that Mr. Hodges was engaged in a

constitutionally protected activity when he filed grievances. *Lewis v. Jacks*, 486 F.3d

1025, 1029 (8th Cir. 2007) ("the filing of a prison grievance … is protected First

Amendment activity"). Instead they argue that they took no action that would chill a

person from protected activity[20] and there is no evidence linking any adverse action in

any way to Mr. Hodges' protected conduct. The Court concludes that the DOC

Defendants are entitled to summary judgment because Mr. Hodges identifies no evidence

suggesting a causal connection between his exercise of his First Amendment rights and

his release back into the general population or the medical care he received.

To satisfy the causation element of a retaliation claim, Mr. Hodges must show "a

causal connection between a defendant's retaliatory animus and [his] subsequent injury."

*Hartman v. Moore*, 547 U.S. 250 (2006). "The causal connection is generally a jury

---

[20]    In their brief, the DOC Defendants argue that because Mr. Hodges continued to
submit kites and engage in the grievance process, they are entitled to summary judgment
on the second element of his retaliation claim. However, "[t]he question is not whether
the plaintiff [him]self was deterred … [but] What would a person of 'ordinary firmness'
have done in reaction to [the adverse action]?" *Garcia v. City of Trenton*, 348 F.3d 726,
729 (8th Cir. 2003)). "The ordinary-firmness test is designed to weed out trivial matters
from substantial violations of the First Amendment." *Gonzalez v. Bendt*, 971 F.3d 742,
745 (8th Cir. 2020) (citing *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013)). The
Eighth Circuit has held that as little as the issuance of several parking tickets in response
to repeated complaints of bikers on the sidewalk is enough to constitute impermissibly
chilling protected activity. *See Garcia*, 348 F.3d 726. However, the Court need not
further analyze this element because Mr. Hodges has not presented any evidence from
which a reasonable jury could infer a causal connection between the decision to send him
back to a particular living unit and his filing of kites and grievances.

question, but it can provide a basis for summary judgment when the "question is so free from doubt as to justify taking it from the jury." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (cleaned up).

Mr. Hodges asserts that evidence of the "temporal proximity"—a matter of weeks—between his submission of kites, grievances, and other correspondences and his release into the same living area as Mr. Osgood is sufficient for a jury to find the required causal connection. This Court disagrees that temporal proximity alone is sufficient to send this claim to a jury. "Temporal proximity is relevant but not dispositive" of a retaliation claim such as this. *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006).

In evaluating retaliation claims, courts look to whether there is "affirmative evidence from which a jury could find retaliatory motive." *Id.* (internal quotations omitted); *see also Wickner v. McComb*, No. CIV. 09-1220 (DWF/JJK), 2010 WL 3385079, at *16 (D. Minn. July 27, 2010) ("Although the grievance and the transfer were 'temporally close,' Plaintiff fails to present any affirmative evidence of a retaliatory motive."), *report and recommendation adopted*, No. CIV. 09-1220 (DWF/JJK), 2010 WL 3385082 (D. Minn. Aug. 23, 2010). For example, in *Santiago*, the plaintiff provided evidence of a causal connection. One correctional officer transferred Mr. Santiago to a cell "without his personal property, proper bedding, a working sink, or a working toilet." The officer attributed that move to another officer (Officer Blair) against whom the plaintiff was pursuing a grievance. 707 F.3d at 994. Mr. Santiago also introduced evidence that after hearing him complain about his placement in the substandard cell, Officer Blair threatened "that things could get worse." *Id.* The *Santiago* court explained

39

that "a reasonable jury could conclude these facts demonstrate that Blair took the above-described adverse actions because of Santiago's continued use of the prison grievance procedure." *Id.*

Here, Mr. Hodges does not identify any comparable affirmative evidence connecting any protected conduct to the decision not to transfer him to another prison, to return him to a living unit where Osgood was also housed, or any aspect of his medical care. Rather, as discussed above, the evidence suggests that the DOC Defendants sent him back to his living unit because they believed (albeit incorrectly) that there was no longer a substantial safety risk if Mr. Hodges and Osgood were in the same area. There is also no evidence in the record indicating that any DOC Defendant interfered with or otherwise dictated the medical care Mr. Hodges received for his eye complaints because of his use of the prison grievance system. Accordingly, the Court concludes that the causal-connection prong is so free from doubt that the DOC Defendants are entitled to summary judgment on Mr. Hodges' First Amendment retaliation claim.

### Centurion Defendants

Centurion makes similar arguments that there is no evidence linking the alleged lack of medical care to Mr. Hodges' use of his free speech. In his response to Centurion's summary judgment motion, Mr. Hodges does not address these arguments or point to any evidence suggesting that he was provided substandard medical care because of any protected activity. A party's failure to oppose a basis for summary judgment is a valid basis for entering judgment against that party. *Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) (concluding that the plaintiff's failure

to come forward with any evidence supporting his retaliation claim "warranted the entry of summary judgment"). Because Mr. Hodges failed to respond to Centurion's motion on this issue, the Court concludes that his retaliation claim has been abandoned and Centurion is entitled to summary judgment on this claim.

Even if Mr. Hodges had not waived the issue, however, there is no affirmative evidence of retaliatory motive on behalf of any Centurion provider in the record. Accordingly, for the same reasons the Court recommends granting the DOC Defendants' motion with respect to this claim, Centurion is entitled to summary judgment as well.

## VI. Remaining State Law Claims

In addition to the constitutional claims addressed above, Mr. Hodges brings negligence and medical-malpractice claims under Minnesota law. He alleges that the Defendants were negligent in placing Mr. Hodges in the same unit as Osgood on November and in providing him medical care for his injuries sustained in the second attack.[21] (Am. Compl. ¶ 55.) Mr. Hodges further alleges that the Department of Corrections and Centurion, through their employees, are liable for medical malpractice. (*Id.* ¶ 56.) The DOC and Centurion move for summary judgment on these claims.

Although the parties have addressed the merits in their briefing, because the Court recommends that the Defendants be granted summary judgment on all of Mr. Hodges' federal claims, the Court concludes that the District Court should decline to exercise

---

[21]    Though in paragraph 55 Mr. Hodges has stated his negligence claims against all Defendants, when read as a whole, the Amended Complaint includes no allegations suggesting that Centurion or any of its personnel engaged in any conduct other than in providing Mr. Hodges medical care.

supplemental jurisdiction over the remaining state law claims. *See, e.g.*, *Johnson v. City of Shorewood*, 360 F.3d 810, 819 (8th Cir. 2004) ("A federal district court has the discretionary power to decline jurisdiction where it has 'dismissed all claims over which it has original jurisdiction.'") (quoting 28 U.S.C. § 1367(c)(3)); *see also Horde v. Elliot*, 2018 WL 087683, at *15 (D. Minn. Jan. 9, 2018) (explaining that a court may *sua sponte* decline supplemental jurisdiction over state-law claims where all federal claims have been dismissed). "The Supreme Court has noted that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine … will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Johnson*, 360 F.3d at 819 (quoting *Carnegie-Mellon U. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). The Eighth Circuit has "stress[ed] the need to exercise judicial restraint and avoid state law issues wherever possible." *Gregoire v. Class*, 236 F.3d 413, 420 (8th Cir. 2000). "The factors a court should consider in determining whether to exercise jurisdiction over pendent state law claims are judicial economy, convenience, fairness, and comity." *Wilson v. Miller*, 821 F.3d 963, 970–71 (8th Cir. 2016) (citing *Cohill*, 484 U.S. at 350).

Here, summary judgment in favor of the Defendants on all of Mr. Hodges' federal claims will leave only his state-law claims over which there is no apparent basis for the Court to exercise original jurisdiction.[22] The Court has considered the factors relevant to the discretionary decision of whether to exercise supplemental jurisdiction. It is true that

---

[22]    In the Notice of Removal, the basis for jurisdiction over the state claims in the original Complaint was supplemental jurisdiction under 28 U.S.C. § 1367. (ECF 1 ¶ 4.)

some considerations may suggest retaining jurisdiction over the state law claims.

Mr. Hodges' state law claims are factually related to his federal claims and the Court has

expended its resources addressing earlier dispositive motions, including a motion to

dismiss and a motion for a preliminary injunction. *Hanson v. Domino*, Civ. No. 10-3895

(JRT/JJK), 2012 WL 7807448, at *12 (D. Minn. Oct. 22, 2012) (weighing these

considerations in deciding that the court should retain jurisdiction over state law claims),

*report and recommendation adopted by*, Civil No. 10-3895 (JRT/JJK), 2013 WL

1249071 (D. Minn. Mar. 26, 2013). However, these considerations do not require a court

to exercise supplemental jurisdiction where no federal claims remain. *See Willman v.*

*Heartland Hosp. East*, 34 F.3d 605, 613 (8th Cir. 1994) ("[W]e have upheld the refusal to

exercise jurisdiction over a state-law claim even though the federal claims were disposed

of late in the proceedings and the court had already devoted significant judicial resources

to the state claim."). In assessing these issues, the Court notes that none of its earlier

decisions involved application of the legal standards by which the negligence and

medical malpractice claims are judged. Nor has any of the Court's prior involvement

addressed the question of official immunity raised by the DOC Defendants. Instead, all

rulings reached or recommended by the Court in this case so far have been abased on

careful analysis of Mr. Hodges' federal claims.

Judicial economy weighs against retaining supplemental jurisdiction over the state

claims. By declining jurisdiction the Court avoids unnecessarily assessing the

reasonableness of each individual DOC Defendant's conduct as compared to the duty, if

any, that each official owed. It also means that the Court will not need to delve into the

professional standard of care under Minnesota law for each Defendant alleged to have engaged in medical malpractice.[23]

Comity also points in favor of remand because Minnesota courts should have the opportunity to rule on issues of purely state law. *See Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 749 (8th Cir. 2009) ("Where, as here, resolution of the remaining claims depends solely on a determination of state law, the Court should decline to exercise jurisdiction.") (internal quotation marks omitted); *Farris v. Exotic Rubber and Plastics of Minn., Inc.,* 165 F. Supp. 2d 916, 919 (D. Minn. Mar. 12, 2001) (citing *Baggett v. First Nat'l Bank*, 117 F.3d 1342, 1353 (11th Cir. 1997) ("State courts, not federal courts, should be the final arbiters of state law.").) In this Court's view, this is particularly true of the question whether Minnesota law would recognize official immunity for all of the DOC Defendants whose conduct is at issue. Though not a terribly complex or novel legal issue, respect for state sovereignty counsels restraint when considering the scope of state government officials' immunity under Minnesota law.

The fairness factor also weighs in favor of remanding this case to Ramsey County District Court. Although the Defendants have sought a ruling on the merits, it would not be unfair to ask them to seek similar relief from the state court if the matter is remanded.

---

[23]    The briefing from the DOC Defendants and Mr. Hodges regarding the viability of the state claims is somewhat lacking in clarity and specificity. It is difficult to discern from their memoranda which facts each side believes are in dispute that pertain to the reasonableness of each particular DOC Defendant's conduct. Illuminating this and other issues would potentially require the Court to engage in a difficult hypothetical task of teasing this information out from the existing briefs or ordering the parties to appear for another argument or supplement their briefing.

The parties have completed discovery and need not reopen any portion of the pre-dispositive-motion litigation if the case is remanded. The Defendants will also certainly benefit from some efficiencies by reusing aspects of their work on these motions should they seek summary judgment from the state court. Meanwhile, remanding the matter to state court will not be unfair to Mr. Hodges. Indeed, it is the forum where he originally chose to file his complaint. (ECF 1.)

For these reasons the Court recommends that the District Court decline to exercise supplemental jurisdiction over Mr. Hodges' negligence and medical-malpractice claims that Defendants' summary judgment motions be denied in part with respect to these claims, and that the state claims be remanded to the Ramsey County District Court.

## VII.    Recommendation

Based on the foregoing, the Court recommends that Defendants' motions for summary judgment (ECF No. 115, 137) be **GRANTED IN PART** and **DENIED IN PART**. The motions should be granted to the extent that Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment deliberate-indifference claims and First Amendment retaliation claims. As a result, Counts 1 and 2 of the Amended Complaint should be **DISMISSED WITH PREJUDICE**. Pursuant to 28 U.S.C. § 1367(c)(3), the District Court should decline to exercise supplemental jurisdiction over the remaining state law claims in Counts 3 and 4 of the Amended Complaint. Because that disposition does not involve a ruling on the merits of those state law claims, the Defendants' motions should be denied to the extent they seek summary judgment on

those claims. Counts 3 and 4 of the Amended Complaint should be remanded to the

Ramsey County District Court.

Date: July 29, 2021

                                              *s/Katherine Menendez*
                                              Katherine Menendez
                                              United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.